**FIFTH DIVISION
MCFADDEN, P. J.,
BROWN and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**May 3, 2023**

# In the Court of Appeals of Georgia

A23A0289. NORTH FULTON COMMUNITY CHARITIES, INC.
v. GOODSTEIN et al.

BROWN, Judge.

In this wrongful death case related to a slip-and-fall filed by Angela Goodstein on behalf of herself and as executor of the estate of her deceased husband, Stephen Goodstein, North Fulton Community Charities, Inc. ("NFCC") appeals from two orders: the trial court's denial of the motion for summary judgment filed by NFCC on Angela's premises liability claim and the trial court's grant of Angela's motion for partial summary judgment on NFCC's failure to mitigate defense. NFCC contends that the trial court erred (1) in finding that fact issues remained on the issue of premises liability because the "prior traversal" rule applies to this case and (2) in concluding that the testimony of NFCC's expert was contradicted by the testimony

of Angela's expert and was, therefore, inadmissible. For the reasons that follow, we affirm.

"Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law. On appeal, we review the grant or denial of summary judgment de novo, construing the evidence and all inferences in a light most favorable to the nonmoving party." *Ridley v. Dolgencorp, LLC*, 353 Ga. App. 561 (839 SE2d 26) (2020). So viewed, the record shows that NFCC is an organization that provides emergency financial and food assistance to residents of North Fulton County. As part of its charitable services, NFCC maintains a food pantry and thrift store located in a building on property which it owns off of Alpharetta Highway in North Fulton County. At approximately 10:00 a.m. on July 19, 2017, Stephen and his 17-year-old daughter, Camille, drove to NFCC's food pantry so that Stephen could pick up food. Camille did not know how many total times she had accompanied her father to NFCC's food pantry, but confirmed that she "went [with him] on a pretty regular basis."[1] According to Camille,

---

[1] According to Angela, Stephen went to NFCC approximately once per week for an unknown period of time, but Angela does not know where Stephen would park when he would go to NFCC.

2

when Stephen went to the food pantry, he would only take two routes, either through an access road that NFCC shares with a neighboring Pep Boys Auto Store ("the Pep Boys route") or through the front entrance ("the front route"). If he went the front route, he would park near the front of the store, and if he took the Pep Boys route, he would park on "the hill"; sometimes he would park on the right side of the hill and sometimes he would park on the left side of the hill and sometimes her father would park his car so that the front of his car was facing down the hill toward NFCC and sometimes he would park his car so that the back of his car was facing down the hill toward NFCC. Camille testified that when Stephen parked on the hill, he did not "tend to park in the same area over and over" but would park wherever there was available space; sometimes he had to parallel park and other times he would pull straight in. Camille did not know if he would park on the hill or in the front parking lot more often. Camille testified that she would sometimes walk into NFCC with her father, but not always.

On this occasion, Stephen took the Pep Boys route, turning into the driveway/access road that NFCC shares with Pep Boys and proceeding down the hill where he parallel parked his car toward the bottom of the hill in a spot on the side of the driveway adjacent to a curb; the front of Stephen's car was pointed toward NFCC.

3

There were no signs prohibiting parking. Stephen exited his car and took a few steps past his car when he realized that he had forgotten his reading glasses and returned to get them. After Camille handed him his glasses, Stephen began walking down the hill again toward the NFCC store when Camille saw him trip and fall on an unmarked raised bump that spanned almost the entire width of the driveway; Stephen had not driven over the bump when he and Camille arrived at NFCC, but they drove over it later when they left.[2] Stephen struck his head, arm, and leg on the asphalt. Camille went to help her father and he said he was "fine" and proceeded into the store, telling her to go back to the car. Photographs in the record show an access road lined with trees on each side, with ample room for at least eight to ten cars to park on each side of the access road, and room to park without traversing the bump.

When Stephen got into the store, NFCC's director of security found him in the bathroom "bleeding pretty heavily" and sat him down in an office and bandaged his head. According to NFCC's director of operations, Stephen "was bleeding bad," and

---

[2] Although Camille was asked many questions about Stephen's habits when visiting NFCC, as detailed above, Camille was never specifically asked during her deposition whether Stephen had parked above or below the bump on prior visits to NFCC or whether she herself remembered walking over the bump when she accompanied her father on prior visits. She was also never specifically asked whether she recalled driving over the bump at any other time except for on the date of the incident.

left a trail of blood throughout the building. The director of operations asked the director of security if he had called 911, and Stephen stated that he did not need an ambulance. After Stephen had been bandaged and his bleeding stanched, the director of security walked Stephen back to his car and asked him if he was okay to drive, and he replied "yes" and then drove off with Camille as a passenger.

The director of security recalls that he kept asking Stephen if he "needed rescue or anything" but Stephen refused, and that he advised Stephen to seek treatment if he began to feel dizzy or ill. He did not believe that Stephen's injuries were serious or life-threatening; if he had, he would have called 911. Camille recalled that the director of security said that Stephen might have to go to the hospital, that "it might be advisable," and that her father was very irritated and said "I'm such an idiot. . . . I can't believe I tripped over that bump."

Camille and Stephen drove straight home, and Stephen went inside, got an ice pack for his head, and lay down on the couch. Camille told her mother that Stephen tripped over a speed bump, and Angela noticed that Stephen had a black-and-blue spot over his eye. Angela testified that it was "a bad scene"; that she was concerned; and that she thought Stephen should go to the emergency room. According to Angela, Stephen "felt like he probably could take care of it, so [she] didn't push it any further.

[She] just wanted him to relax [and] didn't want to stress him out any further." After about 45 minutes, Stephen told Angela that he was going upstairs to lie down and take a nap. At around 3:45 p.m., Stephen was found unconscious on the floor of his bedroom. He was transported by ambulance to the hospital. A CT scan showed that he had a large hemispheric acute subdural hematoma, one of the most devastating forms of traumatic brain injury. Stephen underwent a craniotomy, spent time in the intensive care unit, and was then transferred to a nursing home where he remained until his death almost two years later.

In December 2014, shortly after NFCC's parking lot was repaved and two permanent speed bumps added, an NFCC employee tripped over one of the new unpainted speed bumps in the front parking lot. Following that incident, the new speed bumps in the parking lot were painted yellow so nobody else would fall, but the change in pavement elevation on which Stephen would eventually trip in 2017 was not painted because, according to the director of operations, "[i]t was visible. You could see it. It wasn't the same color as the pavement. . . . You could see . . . the

drainage bump." After Stephen fell, the director of operations painted the bump yellow.[3]

There is some dispute as to whether the raised bump — or change in elevation — over which Stephen tripped is a speed bump or drainage bump/ridge. According to NFCC's director of operations, the bump is "absolutely not a speed bump. It's [for] drainage — it diverts water," and was already present on the property when NFCC purchased it from the previous owner in 2005. NFCC's executive director described the feature as a "drainage ridge" but did not recall hearing it described as such prior to this lawsuit.

According to Angela's expert engineer, who visited the property prior to the bump being painted by NFCC's director of operations, there is no such pavement feature in design called a drainage ridge, and that regardless of what the feature is called, Stephen tripped on an unmarked change in elevation in the asphalt pavement. Moreover,

> [r]egardless of what NFCC representatives call[ ] the structure, it was an abrupt vertical rise in pavement that, except [for] the fact that it was not exactly perpendicular to the gutter line/edge of pavement, was in all

---

[3] We have included this fact for completeness but are not relying on it in reaching our decision affirming the trial court.

7

other ways a speed bump and a [change in pavement elevation]. Most people would refer to the subject change in pavement elevation as a speed bump.

In the expert's opinion, the change in pavement elevation was not properly marked to draw attention and to warn of the change in elevation and was further exacerbated by the mottled appearance of the pavement from the shade covering of the heavy tree canopy above. She pointed out that the bump was comprised of the same asphalt and was the same color as the adjacent pavement. "This, coupled with the heavy tree canopy that limited ambient light, and the absence of signs indicating a difference in pavement elevation, gave no clues to the traveling public, whether by foot or vehicle, that there was a change in pavement elevation." The expert averred in her report that walkway and roadway standards required

> ***all changes in pavement elevation*** to be denoted with a change in color and proper signage to prepare both pedestrians and vehicle operators for the change in elevation of pavement, regardless of what it is called. All other vertical changes in pavement elevations and walking paths on the site were painted except this one. This indicates to the traveling public that all changes in pavement elevation will be painted.

(Emphasis in original.) The photographs of the bump show that it did not extend the entire width of the driveway; that it was the same color as the adjacent pavement; and

8

that on a sunny day, it can appear mottled by shade and sunlight. In one photograph, part of the bump is completely shaded by the shadow of a vehicle.

Angela filed suit against NFCC, alleging claims for negligence, premises liability, and wrongful death. NFCC moved for summary judgment, arguing that Stephen had as much knowledge of the "drainage ridge" over which he tripped and fell as NFCC because he had successfully walked over the "static condition on several prior occasions." One week prior to the expiration of discovery, NFCC filed an amended answer raising the defense of failure to mitigate damages.

Angela filed a combined motion for summary judgment as to the defense of failure to mitigate and a motion to exclude certain causation testimony and opinion testimony sought to be introduced by NFCC's expert Dr. Christopher Koebbe, a neurosurgeon. Following a hearing, the trial court granted Angela's motion for summary judgment on the affirmative defense of mitigation, ruling that Angela's expert could not say to a reasonable degree of medical certainty that Stephen's outcome would have been any different had he come to the hospital any sooner, which testimony undermined NFCC's expert's speculative testimony that a craniotomy would have been performed earlier that same day. The trial court denied NFCC's motion for summary judgment, finding that while Stephen may have visited

9

the premises multiple times and parked on the hill previously, the record does not establish that he "had negotiated this precise hazard — the speed bump — on foot previously. It is not enough that [Stephen] may have been in the 'area.'" The trial court also concluded that the bump was not readily discernable to a person exercising reasonable due care as Angela's expert opined that the bump was not identified by any signage, was shaded by tree cover, and blended in with the surrounding pavement of the same color. This appeal followed.

1. NFCC contends that the trial court erred in denying its motion for summary judgment because the prior traversal rule applies. We disagree.[4]

> Under OCGA § 51-3-1, a person who owns or occupies land and by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe. In order to recover on a premises liability claim, a plaintiff must show (1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier. Accordingly, the fundamental basis for an owner or occupier's liability

---

[4] Angela's motion for leave to file supplemental brief is granted. NFCC's conditional motion for permission to file response to Angela's supplemental brief is also granted.

10

is that party's superior knowledge of the hazard encountered by the plaintiff. In other words, a plaintiff is not entitled to recovery if the undisputed evidence demonstrates that the plaintiff's knowledge of the hazard was equal to or greater than that of the defendant.

(Citation and punctuation omitted.) *Gervin v. Retail Property Trust*, 354 Ga. App. 11, 12-13 (1) (840 SE2d 101) (2020). "In slip-and-fall actions, summary judgment is appropriate only in plain, palpable, and undisputed cases." (Citation and punctuation omitted.) *Ingles Markets v. Seymour*, 356 Ga. App. 889, 890 (849 SE2d 715) (2020).

When a case involves allegations of a static condition,[5] "the rule is well established that the basis of the proprietor's liability is his superior knowledge and if his invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does." (Citation and punctuation omitted.)

---

[5] "A static condition is one that does not change and is dangerous only if someone fails to see it and walks into it." (Citation and punctuation omitted.) *D'Elia v. Phillips Edison & Co.*, 354 Ga. App. 696, 698 (839 SE2d 721) (2020). For example, "broken, missing, or uneven pavement is a static condition." (Citation and punctuation omitted.) *Nemeth v. RREEF America*, 283 Ga. App. 795, 797 (1) (643 SE2d 283) (2007). As is a concrete parking lot abutment. See *Ridley*, 353 Ga. App. at 563.

*Perkins v. Val D'Aosta Co.*, 305 Ga. App. 126, 128 (699 SE2d 380) (2010). What differentiates a claim involving a static condition from other slip and fall cases is that

> when a person has successfully negotiated an alleged dangerous condition on a previous occasion, that person is presumed to have equal knowledge of it and cannot recover for a subsequent injury resulting therefrom.

(Citation and punctuation omitted.) *Gervin*, 354 Ga. App. at 13-14 (1). This rule is referred to as the prior traversal rule. See id. at 13 (1). "Nevertheless, the [prior traversal rule] applies only to cases involving a static condition that is 'readily discernible' to a person exercising reasonable care for his own safety." (Citation and punctuation omitted.) *Perkins*, 305 Ga. App. at 128-129.

NFCC contends that the "prior traversal rule" applies even when there is no testimony or admission of a prior traversal from the plaintiff. Citing to *Rutherford v. Revco Drug Centers*, 301 Ga. App. 702, 706 (689 SE2d 59) (2009), NFCC contends that this Court has inferred that the plaintiff must have previously traversed a ramp leading into and out of a store when there was no evidence that the plaintiff could have gained access to the store by some other way. This purported inference, however, was drawn only by the dissent in that case. Id. at 706 (Andrews, J., dissenting). Indeed, this Court *reversed* the grant of summary judgment in that case,

12

finding that "the fact that [the plaintiff] had walked into the store once does not as a matter of law give her actual or constructive knowledge of the hazard she faced walking out of the store directly onto the steep ramp." Id. at 703. This Court concluded that material issues of fact existed as to whether the hazard allegedly causing the plaintiff's accident was readily observable to her in the exercise of ordinary care. Thus, *Rutherford* has no bearing on this case. Similarly, NFCC's reliance on *Landings Assn. v. Williams*, 291 Ga. 397 (728 SE2d 577) (2012), is misplaced in this case because that case is based on a conclusion that the victim assumed the risk of walking in an area inhabited by wild alligators and that she had knowledge equal to defendants about the presence of alligators in the community. Id. at 399.

In this case, there is no evidence that Stephen traversed the bump previously. We do not agree with NFCC's contention that because Stephen had previously traveled down the access road both in his car and on foot, he must have traversed the bump previously as it is impossible to travel up or down the length of the road without crossing it. While Camille testified that Stephen parked on the hill previously, she was never asked whether he walked over the bump and never testified that he previously traversed the bump. Accordingly, we cannot say that the evidence

was plain, palpable, and undisputed as to demand the entry of summary judgment in NFCC's favor. See *Shackelford v. DeKalb Farmer's Mkt.*, 180 Ga. App. 348, 351 (2) (349 SE2d 241) (1986) (summary judgment in favor of defendant not warranted in part because "there [was] no evidence that appellant had ever had prior occasion to step over the wet bumpers in the outside cart storage area where her subsequent fall actually took place").

Additionally, we decline to find that Stephen's act of driving over the bump in his vehicle equates with walking over the bump for the purpose of establishing that he "successfully negotiated [the] alleged dangerous condition on a previous occasion," and is therefore presumed to have knowledge of it. In this regard, NFCC cites to this Court's decision in *February v. Averitt Properties*, 242 Ga. App. 137 (528 SE2d 880) (2000), claiming that it stands for the proposition that it is sufficient evidence that a plaintiff learned of an alleged hazard from a vehicle to establish knowledge; it is not necessary that the plaintiff walked over the alleged hazard. While the plaintiff in *February* backed his truck up a ramp upon which he later fell, and therefore had actual knowledge of the approximate dimensions and elevation of the ramp, our decision was not based entirely on the fact that the plaintiff learned of the hazard from a vehicle. Id. at 140 (2) (a). Indeed, our opinion goes on to find that once

14

the plaintiff parked his truck, he also "*walked* up the ramp on the driver's side of the truck, where the width of the exposed ramp was, at most, 18 inches. Moments later, he walked down the ramp on the same side to retrieve the rope." (Emphasis supplied.) Id. Accordingly, he "knew or should have known of the presence and potential danger of the ramp." Id. Because the plaintiff in *February* learned of the hazard both from his vehicle and by traversing it by foot, that case is inapposite to the facts here and *does not* stand for the proposition that it is sufficient evidence that a plaintiff learned of an alleged hazard from a vehicle to establish knowledge.

Moreover, viewed in the light most favorable to Angela as the nonmovant, "we find that the evidence of record creates a material issue of fact as to whether the specific hazard allegedly precipitating [Stephen's] fall was readily observable [or discernible] to him in the exercise of ordinary care and whether he can therefore be presumed to have knowledge of it." (Citations and punctuation omitted.) *Perkins*, 305 Ga. App. at 130. In this case, there was ample evidence that NFCC did not warn the public of this particular change in elevation in the pavement. Additionally, Angela presented evidence that the bump was difficult to see because it was the same color as the adjacent pavement, which was further exacerbated by the mottled appearance of the pavement from the shade covering of the heavy tree canopy above. See, e.g.,

15

*Pinder v. H & H Food Svcs.*, 326 Ga. App. 493, 502 (3) (756 SE2d 721) (2014) (physical precedent only) (reversing grant of summary judgment where question of fact remained because even if the plaintiff had traversed the hazard, an optical illusion made it appear that the place where the plaintiff stepped was flush with the sidewalk); *Perkins*, 305 Ga. App. at 130 (poor lighting, darkened surfaces, and lack of warning raised a factual question about whether the plaintiff should have seen the curb over which he tripped); *Hagadorn v. Prudential Ins. Co.*, 267 Ga. App. 143, 145 (598 SE2d 865) (2004) (reversing summary judgment where evidence showed that lighting conditions and design of catch basin created optical illusion that prevented plaintiff from appreciating the severity of the slope that caused her fall; additionally, no paint markings alerted pedestrians to the presence of the steep grade); *Myers v. Harris*, 257 Ga. App. 286, 288 (1) (570 SE2d 600) (2002) (reversing summary judgment where plaintiff testified that furniture in showroom camouflaged the fact floor dropped off onto the ramp below, even where plaintiff had previously negotiated the ramp up to the raised floor); *Shackelford*, 180 Ga. App. at 351 (2) (summary judgment in favor of defendant not warranted in part where evidence showed that rain created optical illusion that seemingly caused parking bumpers to "merge" with the pavement). Compare *Crebs v. Bass Pro Outdoor World*, 360 Ga. App. 121, 124, n.4 (860 SE2d

16

802) (2021) (affirming grant of summary judgment to defendant in slip and fall because fence over which plaintiff tripped and fell was open and obvious, but distinguishing *Pinder*, *Hagadorn*, and *Perkins* on ground the static conditions in those cases were not discernable due to optical illusions and evidence of poor lighting).[6] As our Supreme Court has advised:

[6] NFCC stresses that our holding in *Milledgeville Manor Partners v. Lewis*, 328 Ga. App. 482 (763 SE2d 723) (2014) applies, claiming that where there is undisputed evidence that the plaintiff knew about the specific condition at issue, the prior traversal doctrine applies whether the condition is readily discernible or not. But *Lewis* is distinguishable. In that case, the plaintiff, a tenant of the defendant's apartment complex, used a clothesline behind her apartment. Id. at 482. While using the clothesline one day, she noticed a small hole in the ground. Id. Over the next few weeks, the hole grew larger. Id. The plaintiff informed a groundskeeper and another person employed by defendant, but never checked to see whether the hole had been repaired. Id. at 483. Several weeks later, the plaintiff walked out of her apartment, crossed near the clothesline and fell into the hole, fracturing her ankle. Id. The plaintiff claimed that she did not see the hole that day because grass had grown over it, concealing it. Id. The trial court denied the defendant's motion for summary judgment and this Court reversed, concluding that the undisputed evidence established as a matter of law that the plaintiff's knowledge of the hazard on the property was equal or superior to that of the defendant. Id. at 485-485 (1). Unlike in the instant case, in *Lewis* there was direct evidence that the plaintiff knew of the hazard and had even advised others of the hazard.

During oral argument in this case, NFCC also argued that this Court's decision in *Ridley* controls because the undisputed evidence in that case showed that the plaintiff knew about the hazard. But just like *Lewis*, *Ridley* is also distinguishable. In that case, the undisputed evidence established that the plaintiff had equal knowledge of the parking abutment over which she tripped and fell when leaving the defendant's store. *Ridley*, 353 Ga. App. at 563. The plaintiff deposed that she had visited the premises between 20 and 25 times before the fall and was familiar with the parking

In sum, we remind members of the judiciary that the "routine" issues of premises liability, i.e., the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication, and that summary judgment is granted only when the evidence is plain, palpable, and undisputed. To put it in more concrete terms, this means that issues such as how closely a particular retailer should monitor its premises and approaches, what retailers should know about the property's condition at any given time, how vigilant patrons must be for their own safety in various settings, and where customers should be held responsible for looking or not looking are all questions that, in general, must be answered by juries as a matter of fact rather than by judges as a matter of law.

(Citation and punctuation omitted.) *American Multi-Cinema v. Brown*, 285 Ga. 442, 445 (2) (679 SE2d 25) (2009).

---

lot and "admitted the parking abutments were plainly visible from a good distance away." Id. at 564. She also admitted that she was aware of the general height and dimensions of the abutments and that there was a risk of tripping over them. Id. She had also successfully traversed the same area ten minutes before when she entered the store, and there was nothing preventing her from observing the abutments; the day was clear and sunny and there was no problem with lighting in the area. Id. Additionally, the plaintiff acknowledged that she was distracted by the display rack and the ground around the display rack instead of the parking area where she was walking. Id.

2. NFCC contends that the trial court erred in granting summary judgment to Angela on its mitigation defense. We disagree, but for a reason other than the one given by the trial court.

Georgia's mitigation of damages rule is set forth in OCGA § 51-12-11, which provides that "[w]hen a person is injured by the negligence of another, he must mitigate his damages as far as is practicable by the use of ordinary care and diligence." Citing to *Georgia Farm Bureau Mut. Ins. Co. v. Turpin*, 294 Ga. App. 63 (668 SE2d 518) (2008), NFCC argues that when a plaintiff fails to obtain available treatment for his or her injuries, or otherwise fails to exercise ordinary care and diligence, this can constitute evidence that a plaintiff failed to mitigate his damages. Id. at 66 (2). As NFCC points out, in *Turpin*, this Court found as follows:

> In support of its argument that the trial court should have charged the jury on the appellees' duty to mitigate, [appellants] rely solely on *Findlay v. Griffin*[, 225 Ga. App. 475 (484 SE2d 80) (1997)] and *Dascombe v. Hanley*, [270 Ga. App. 355 (606 SE2d 602) (2004),] both of which are distinguishable from the instant case. In *Findlay*, we held that the charge on the duty to mitigate was required where there was evidence introduced that the plaintiff stopped treatment. Similarly, in *Dascombe*, we held that the charge on duty to mitigate was required where plaintiff failed to obtain the recommended treatment. In this case, Farm Bureau presented no evidence that the Turpins engaged in

19

activities that aggravated their conditions, stopped treatment despite medical advice, failed to obtain available treatment for their injuries, or otherwise failed to exercise ordinary care and diligence. Accordingly, the trial court did not err by refusing the charge on the duty to mitigate damages.

Id. at 66-67 (2). But, the fact that we listed "failed to obtain available treatment for their injuries" as evidence absent from the case should not be construed as a holding that any such evidence authorizes a mitigation defense under all fact scenarios. This is particularly true when the case cited for this statement involved a plaintiff's one-year delay in obtaining a recommended test due to "denial" of his injuries and failure to seek recommended physical therapy after the test was eventually sought. See *Dascombe*, 270 Ga. App. at 360 (3).

Angela contends that this Court has never held that a plaintiff's *delay* in seeking initial treatment "should thwart a victim's ability to recover from a tortfeasor." While technically true, we must acknowledge that in *Rosenthal v. O'Neal*, 108 Ga. App. 54 (132 SE2d 150) (1963), this Court noted that the decedent, "by refusing to go to a hospital when he was injured failed to exercise the proper care to obtain treatment, as it was his duty to do, [and therefore authorized the jury to] lessen his damages for pain and suffering." Id. at 54-55 (1). On appeal, the decedent's wife

20

alleged that the amount of the verdict was so small as to shock the conscience. Id. at 54. But *Rosenthal* fails to include *any* pertinent facts, such as the nature of the decedent's injuries and the particular circumstances of his refusal, including whether he ignored the advice of a physician to obtain treatment. Without these facts, the precedential value of *Rosenthal* is extremely limited and care should be taken not to apply the language employed in it too broadly. *Rosenthal*, therefore, does not require a different outcome in this case. What our cases have clearly held is that a jury charge on the duty to mitigate damages is authorized where a plaintiff fails to follow his or her doctor's instructions, stops treatment contrary to medical advice, or fails to obtain available treatments recommended by a treating physician. See *Dascombe*, 270 Ga. App. at 360 (3); *DeVooght v. Hobbs*, 265 Ga. App. 329, 333 (2) (d) (593 SE2d 868) (2004) (plaintiff missed six-week post-operative appointment); *Findlay*, 225 Ga. App. at 476 (2) (plaintiff "may have stopped treatment"). Similarly, we have held that a charge on the duty to mitigate is justified where there was evidence presented that the plaintiff's failure to follow her doctor's advice may have aggravated her condition. See *Hannula v. Ramey*, 177 Ga. App. 512, 513 (339 SE2d 735) (1986). Having considered the body of Georgia law on the mitigation of damages, we decline, under the particular facts and circumstances of this case, to hold that a plaintiff who has

been injured — but fails to recognize the enormity and severity of that injury — has an affirmative duty to mitigate his damages by seeking treatment for that injury. Thus, summary judgment in favor of Angela is proper on NFCC's defense of failure to mitigate.

As noted previously, the trial court granted summary judgment to Angela on NFCC's defense of failure to mitigate based on its conclusion that Angela's expert could not say to a reasonable degree of medical certainty that Stephen's outcome would have been any different had he come to the hospital any sooner, which testimony undermined NFCC's expert's speculative testimony that a craniotomy would have been performed earlier that same day.[7] Even though we are not upholding summary judgment on this ground, "a judgment that is right for any reason will be

---

[7] The trial court did not rule on Angela's motion in limine to exclude the testimony of Dr. Christopher Koebbe, which was filed in combination with Angela's motion for summary judgment, and we decline to interpret the express grant of Angela's motion for summary judgment as an implied ruling on her motion in limine. While neither side specifically challenges any ruling as to Dr. Koebbe's testimony, we note that nothing in our opinion should be interpreted as a ruling on the admissibility of Dr. Koebbe's testimony. "This is a court for the correction of errors of law made by the trial courts, and an error of law has as its basis a specific ruling made by the trial court. In the absence of such a specific ruling, there is nothing for us to review." (Citations and punctuation omitted.) *Howell v. Beauly, Inc.*, 337 Ga. App. 898, 901 (2) (789 SE2d 214) (2016). See also *Pneumo Abex, LLC v. Long*, 357 Ga. App. 17, 29-30 (2) (849 SE2d 746) (2020).

affirmed." *Talley v. Housing Auth. of Columbus*, 279 Ga. App. 94, 95 (2) (630 SE2d 550) (2006).

*Judgment affirmed. McFadden, P. J., and Markle, J., concur.*